Filed 4/7/25  P. v. Vega CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051017 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS092456A) |
| v. | |
| JUAN MANUEL VEGA, | |
| Defendant and Appellant. | |

Convicted by plea of drug trafficking offenses, defendant Juan Manuel Vega[1] later moved under Penal Code section 1473.7, subdivision (a)(1) to vacate his conviction and withdraw his no contest plea.[2]  After an evidentiary hearing, the superior court denied the motion, finding Vega's testimony not credible.  Although Vega presented objective evidence tending to corroborate his claims, our review on appeal requires deference to the superior court's assessment of Vega's credibility and determination that Vega "was aware of the immigration consequences" when he pleaded no contest.  So we will affirm.

---

[1] Like the parties, we use the name the trial court and Vega generally used in the trial court proceedings, but we note that Vega gave his full name as Juan Manuel Alejandro Vega Rivera when he testified.

[2] Undesignated statutory references are to the Penal Code.

## I.    BACKGROUND

In November 2009, the Monterey County District Attorney charged Vega with (1) felony transportation and sale of cocaine (Health & Saf. Code, § 11352, subd. (a)); (2) felony transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)); (3) felony possession of cocaine for sale (Health & Saf. Code, § 11351); (4) felony possession of methamphetamine for sale (Health & Saf. Code, § 11378); (5) felony possession of marijuana for sale (Health & Saf. Code, § 11359); and (6) misdemeanor possession of false government identification (§ 529.5, subd. (c)).

At the preliminary hearing, Detective Sergeant Bruno Dias testified that he detained Vega and a woman during a suspected hand-to-hand drug sale.  Vega had a bindle of powder cocaine in his hand and more bindles—cocaine and methamphetamine—in his backpack.  The woman admitted she had intended to purchase $20 worth of cocaine from Vega.

Vega admitted selling cocaine and methamphetamine, explaining that he had begun a few weeks earlier, lacking the resources to care for his young children.  Law enforcement found additional drugs, a digital scale, a cutting agent, and a suspected pay-owe sheet.  Vega's phone rang as it was being booked into evidence, the caller offering to pay her existing debt and to purchase " 'another 40.' "

Upon arrest, Vega was subject to an immigration hold.

In January 2010, Vega pleaded no contest to counts 1 and 4 to receive felony probation.  The plea form that Vega initialed and signed included as the tenth item this advisement:  "I understand that if I am not a citizen of the United States, a plea of Guilty/No Contest will result in deportation, exclusion from admission to this country, denial of naturalization and/or denial of re-entry to this country."[3]  An interpreter signed

---

[3] A court before accepting a plea of guilty or no contest must advise the defendant: "If you are not a citizen, . . . conviction of the offense for which you have been charged

the form, affirming that he translated the form into Spanish for Vega. At the hearing, with an interpreter assisting, the trial court asked, "Did the interpreter read item [n]umber 10 on the plea form to you concerning citizenship and immigration consequences?" Vega said, "Yes." The trial court also confirmed that counsel had "made the proper inquiry and advisement." Vega was also advised that the maximum possible sentence for the offenses (and the potential consequence of a probation violation) was five years eight months in prison, with a minimum of three years on parole.

The probation officer reported that, when interviewed in anticipation of sentencing, Vega hesitantly admitted to selling narcotics but "made every attempt to minimize his behavior." Vega told the probation officer that he would like leniency "for the sake of his children. He would like the opportunity to be near his children and help his wife raise them."

At the February 2010 sentencing hearing, Vega's counsel cited Vega's immigration hold as a basis for a time-served sentence (208 days) rather than the 240 days Vega's brother received.[4] Among the terms of his probation, Vega was required to serve 270 days in county jail with 208 days credit for time served. In the event Vega was "deported, probation shall revert to non-reporting. Do not reenter the

---

*may have* the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." (§ 1016.5, subd. (a), italics added.) Vega makes no claim of section 1016.5 error.

Counsel must independently advise the defendant of the immigration consequences of a proposed disposition. (§ 1016.3; see also *Padilla v. Kentucky* (2010) 559 U.S. 356.)

[4] The original complaint against Vega also named one of his brothers as a defendant, and Vega's brother also pleaded no contest to drug charges.

U.S. unless legally.  Upon re-entry to the U.S., you must report to the probation officer within 72 hours.  Any illegal entry into the U.S. will be deemed a violation of probation."

Vega was removed from the United States in March 2010.

In 2015, with the assistance of the same attorney who represented him in the underlying criminal case, Vega petitioned for dismissal of his convictions under section 1203.4.  The prosecution did not oppose dismissal but represented that Vega had never been supervised by probation because he had been deported.  The trial court granted Vega's petition.

In 2022, Vega moved to withdraw his guilty plea under section 1473.7, subdivision (a)(1), on the ground that he had not been advised that his convictions subjected him to mandatory deportation.  (See 8 U.S.C. § 1101(a)(43)(B).)[5]  Vega declared that he "would not have accepted [the] plea if [he knew] that [the] conviction could result in permanent mandatory removal and denial of immigration benefits or relief for life, no matter how good a life [he] were to lead in the future."  He noted that at the time of his plea he "had strong family, community ties, obligations, and opportunities in [the] United States and . . . would have faced extreme hardship if [he] was forced to return to [his] country."  He was then the father of two United States born children at the time of his conviction.  Since his conviction, Vega fathered two more United States citizen children and had worked at Carmel Valley Ranch for 10 years as of November 2021.[6]

_____

[5] Although a defendant unlawfully present in the United States is subject to removal at any time, removal is mandatory upon conviction for an aggravated felony, and an aggravated felony conviction also forecloses any relief from removal (including asylum) and any prospect of future admission to the country.  (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 187–188.)

[6] Besides proof of his 10 years' employment at Carmel Valley Ranch, Vega supplied a certification in the name of "Felipe R. Vazquez" from the Electrician

At the evidentiary hearing on his motion, Vega testified as follows. Vega is a Mexican citizen who first came to the United States in 2003, then 19 years old and married to his first wife, who was born in Mexico. By 2009, the couple had two children born in the United States, though Vega's parents and five of his six siblings were still living in Mexico.

On direct examination, Vega testified that when he made the plea he was not told that it would cause him to be removable from the United States, and denied virtually all immigration benefits, "for the rest of [his] life." He testified that nobody described the term, "aggravated felony." He testified that he was not advised that his plea would cause him to be denied a release bond if he was put in immigration custody or that a good deal in state court could be offset by being stuck in immigration custody. He would not have accepted the plea deal if he had known about those negative consequences. He would instead "have looked -- or would have researched on a better judgment, something that would have been better for me, better trial." Vega would have been willing to spend more time in jail for an immigration-safe conviction. Vega acknowledged having discussed immigration consequences with his then-attorney, who told him "not to worry about that because in the future [he] would be able to get [the convictions] dismissed." And Vega recalled stating in his probation interview that he was worried about being with his children.

Vega had petitioned for the section 1203.4 dismissal believing it would mitigate the immigration consequences of his convictions. So a few years after the dismissal, Vega's second wife, a United States citizen, petitioned to adjust his status. Vega then discovered that the section 1203.4 dismissal was ineffectual for immigration purposes.

---

Certification Unit of the Division of Labor Standards Enforcement and a time card indicating that Vega worked a week for RK Electric in November 2021.

5

On cross-examination, when asked whether he had been selling drugs in 2009, Vega said, "[T]hat's what they charged me with." Asked if he recalled telling the police he was selling drugs to supplement his income, Vega testified that he could not remember because it had "been a long time." (The trial court overruled defense objections to this line of questioning, ruling that the question went to Vega's credibility.)

Questioned by the trial court, Vega agreed that he initialed and signed a plea form. Vega initially testified that there was no interpreter present, then said he did not remember, before agreeing that there was an interpreter present based on the interpreter's signature. Vega initially denied recalling whether the immigration advisement on the form had been read to him, but after reviewing the transcript, he agreed that the interpreter had read it to him.

On redirect examination, Vega agreed that the plea form's advisement did not disclose that the immigration consequences described would apply for his entire life.

The trial court denied Vega's motion. The trial court reasoned that the evidence of Vega's guilt was strong and Vega had been aware of the immigration consequences he was facing. The trial court ruled that there was not "sufficient objective evidence to support [Vega's] statements. [The court did not] find [Vega] credible that he would not have accepted this plea agreement."

Vega timely appealed.

## II. DISCUSSION

Vega contends that considering the evidence submitted to the trial court, even deferring to the trial court's adverse assessment of his credibility, he is entitled to relief under section 1473.7, subdivision (a)(1). Because it was Vega's burden to prove the factual predicates for relief under section 1473.7, and because we must defer to the trial court's express and implied factual findings, we must affirm.

6

**A.** *Legal Principles and Standard of Review*

A defendant no longer serving a sentence may move to vacate a conviction "due to prejudicial error damaging the [defendant's] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1).) The defendant bears the burden of proving by a preponderance of the evidence both prejudicial error and that the challenged conviction or sentence "is currently causing or has the potential to cause removal or the denial of an application for an immigration benefit, lawful status, or naturalization." (§ 1473.7, subd. (e)(1).)

We defer to the trial court's factual findings when based on " ' "the credibility of witnesses the [superior court] heard and observed" ' " but independently review whether these facts support a reasonable probability that the moving defendant would have rejected the plea if properly advised. (See *People v. Vivar* (2021) 11 Cal.5th 510, 527–528 (*Vivar*); see also *People v. Espinoza* (2023) 14 Cal.5th 311, 319–320 (*Espinoza*).)

**B.** *Vega's Understanding of the Immigration Consequences of His Plea*

Vega contends that he misunderstood the immigration consequences of his plea because he was never told "that the consequences were for life and could not be remedied by dismissal of the case." (See *Espinoza*, *supra*, 14 Cal.5th at p. 319 ["defendant must first show that he did not meaningfully understand the immigration consequences of his plea"].) Our decision, however, is constrained by the trial court's finding that Vega, despite his contrary testimony, "was aware of the immigration consequences" when he entered his plea. Deferring to the trial court's assessment of Vega's credibility as a witness, we cannot fault the court's determination that Vega did not prove his misunderstanding of his plea's consequences, even if another trier of fact might have found the facts differently.

In its oral ruling, the trial court did not specify which "immigration consequences" it found Vega to have understood when entering his plea. But it cited the facts that Vega

7

had been advised of the "immigration consequences" and was subject to an immigration hold. At the hearing, Vega acknowledged that before entering his plea he had been alerted that conviction "*will result* in deportation, exclusion from admission to this country, denial of naturalization and/or denial of re-entry to this country." (Italics added.) The advisement lacked any temporal limitation. Given the scope of the advisement, we do not understand the trial court's reference to "immigration consequences" to be limited to deportation. And Vega's contemporaneous concern about being able to be near his children and help raise them, and his counsel's express reliance on the immigration hold to argue for leniency, lent support to the trial court's inference that Vega was aware of the likelihood of deportation before he pleaded and did not expect to be able to return.

Vega testified that he did not understand that his plea would deprive him of immigration benefits for life, explaining that his counsel assured him that he need not worry about the immigration consequences because he could in the future have his conviction dismissed. But his counsel made this same point before the trial court. So we understand the trial court's finding that Vega was both aware of the "immigration consequences" of his plea and not "credible" in testifying that he would not have accepted this plea agreement as rejection of Vega's testimony about the advice he received from counsel. The trial court implicitly found either that Vega's testimony about receiving deficient advice from counsel was not credible, or that any deficiencies in counsel's advice were cured by the advisement on the plea form and Vega's acknowledgment both in writing and in the plea colloquy. The trial court could plausibly infer that Vega did not rely on the advice he attributed to his counsel, given Vega's own evidence that he returned to the United States not long after his removal, years before his section 1203.4 dismissal.

On appeal, Vega contends that the written advisement was inadequate to inform him that he would be subject to deportation, exclusion, denial of naturalization, *and*

denial of re-entry because the form used "and/or" instead of "and." To be sure, using "and" as the conjunction would prevent the potential confusion Vega argues for the first time on appeal. (See *People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 659, 666 [addressing advisement that used "and" rather than "and/or"].) But testifying in the trial court, Vega never claimed to have been confused about the array of mandatory consequences of his conviction. If Vega did not understand that a mandatory consequence of his conviction would be his deportation and exclusion from this country, he could have said so at the hearing but did not.[7] Instead, he testified that the form was confusing merely because it failed to specify that the consequences would persist for life and could not be overcome by securing a post-conviction dismissal.

We note as well that Vega's factual testimony about his understanding of the immigration consequences of his plea at the time it was entered is not corroborated by any contemporaneous evidence. Vega contends that the plea advisement was insufficient to disabuse him of the notion that a dismissal could terminate the immigration consequences of his conviction. But because nothing in the advisement suggests that the immigration consequences are merely temporary, it did not aid him in meeting his burden of proof. Vega's reliance on language in his probation terms contemplating that he might not be deported or, if deported, might reenter the United States is similarly unhelpful. Probation terms imposed only at a later sentencing hearing cannot be said to have

---

[7] Vega's written declaration does not permit us to override the trial court's assessment of Vega's credibility as a testifying witness. (Cf. *Vivar*, *supra*, 11 Cal.5th at p. 528 [finding "no reason to conclude the trial court has the same special purchase on the question at issue" when deciding solely on declarations and documentary evidence]; *Espinoza*, *supra*, 14 Cal.5th at p. 320 [accord].) At the hearing, Vega testified that he understood some of the declaration, but not all of it. So, in context, the statements in the declaration that Vega "did not meaningfully understand that this conviction could become a removable offense," that he "did not ask questions," and that "[o]ne of the determinative factors in [his] decision to accept or reject a plea offer was not having immigration consequences" are not credible.

9

informed Vega's understanding at the time of his plea. Although it may be proven in different ways, our focus is on Vega's understanding when he accepted the plea. (See *Espinoza*, *supra*, 14 Cal.5th at p. 319.)

Vega's subsequent petition for post-conviction relief and his wife's application to adjust his status are objective evidence that strongly suggest that—by the time his wife applied—Vega believed the immigration consequences of his conviction were no longer mandatory. Vega would not have alerted the immigration authorities to his presence in this country if he understood that he would expose himself to deportation. (See *People v. Alatorre* (2021) 70 Cal.App.5th 747, 769–770 ["It goes without saying that someone who understood his criminal conviction made him automatically deportable would not voluntarily contact immigration authorities and advise them of his presence in the country"]; see also *Espinoza*, *supra*, 14 Cal.5th at p. 320.) But neither *Alatorre* nor *Espinoza* involved a trial court's adverse credibility finding on the disputed issue. (*Alatorre*, at p. 755, fn. 7 [noting "limited credibility findings that have no bearing on" the dispositive issue of Alatorre's reasonable diligence in bringing his motion]; *Espinoza*, at p. 320 [concluding "no deference is owed" because "the trial court's findings 'derive entirely from written declarations and other documents' "].)

Here, the trial court gauging Vega's credibility as a witness could properly consider these later efforts insufficiently probative of his understanding or his counsel's advice when he entered his plea several years earlier. There were more than five years between the plea and the section 1203.4 motion for dismissal, more than enough time to erode Vega's understanding of the law (or his counsel's). The trial court's factual finding can be reconciled with Vega's later motion to dismiss and his second wife's application: Vega could have correctly understood but undervalued the permanency of his immigration consequences at the time of his plea, when he had no obvious means of adjusting his status, only to develop misplaced optimism after marrying his second wife. And aside from Vega's testimony, there is neither direct evidence of counsel's

10

understanding at any time of the immigration consequences nor corroboration of counsel's advice to Vega.[8]  (Cf. *People v. Camacho* (2019) 32 Cal.App.5th 998, 1009 ["claims of error were supported by . . . former attorney's undisputed testimony that he told defendant only that the charge *could* subject him to deportation and that 'we're going to get it down to a misdemeanor and expunged early and maybe that will help' "]; *People v. Manzanilla* (2022) 80 Cal.App.5th 891, 905–906 (*Manzanilla*) [counsel's contemporaneous notes reflected "the kind of description one would give if they wanted to avoid actually stating that deportation would ensue"].)

With that in mind, we return to the deference we owe trial court factual findings based on the trial court's personal observation of witnesses.  (*Vivar*, *supra*, 11 Cal.5th at pp. 527–528.)  The trial court watched Vega testify to his understanding of the immigration consequences of his plea, evaluated the objective evidence Vega presented to support his testimony, and decided that the objective evidence was not "sufficient . . . to support [Vega's] statements."  The objective evidence Vega mustered is not so weighty that it overrides our deference to the trial court's factual finding.

We do not mean to suggest that Vega was required to provide a declaration from plea counsel or contemporaneous documentation from the time of the plea.  (*Espinoza*, *supra*, 14 Cal.5th at p. 325 [noting that the inclusion of counsel's declaration in *Vivar* did not suggest a "minimum requirement[] for establishing prejudicial error"].)  Nor do we consider a boilerplate plea form advisement to satisfy counsel's independent obligation to provide a client with competent, case-specific advice on immigration consequences including but not limited to the long-term impact of a conviction on future prospects for

---

[8] The People observe that Vega might have had reasons for seeking a section 1203.4 dismissal unrelated to the immigration consequences, such as to obtain employment.  While this line of argument is speculative, it does highlight the paucity of objective evidence concerning the advice Vega received from counsel, including its timing and substance.

11

admission or administrative relief from removal. (See, e.g., *Manzanilla*, *supra*, 80 Cal.App.5th 891; *People v. Lopez* (2021) 66 Cal.App.5th 561.) But the trial court determined that, at least at the entry of Vega's plea (before marriage to a United States citizen supplied a theoretical basis for adjusting his status), Vega accepted the immigration consequences that would prevent him from raising his children in the United States. The plausibility of a more favorable factual finding or credibility determination does not permit us to conclude that the trial court's was in error.

## III. DISPOSITION

The trial court's March 16, 2023 denial of Vega's motion to withdraw his guilty plea is affirmed.

_____
LIE, J.

WE CONCUR:


_____
DANNER, Acting P. J.



_____
BROMBERG, J.




*People v. Vega*
H051017